Matter of Lost Lake Holdings LLC v Town of Forestburgh (2024 NY Slip Op 01364)

Matter of Lost Lake Holdings LLC v Town of Forestburgh

2024 NY Slip Op 01364

Decided on March 14, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:March 14, 2024

CV-23-0407 CV-23-1168 CV-23-1305
[*1]In the Matter of Lost Lake Holdings LLC et al., Appellants,
v
Town of Forestburgh et al., Respondents.

Calendar Date:January 18, 2024

Before:Egan Jr., J.P., Clark, Lynch, McShan and Mackey, JJ.

SBarshovLaw PLLC, Haverstraw (Steven Barshov of counsel), for appellants.
Harris Beach PLLC, Albany (Javid Afzali of counsel), for respondents.

Lynch, J.
Appeals (1) from an order of the Supreme Court (David M. Gandin, J.), entered August 12, 2022 in Sullivan County, which, among other things, in a combined proceeding pursuant to CPLR article 78 and action for declaratory judgment, granted respondents' motion to dismiss certain causes of action, (2) from an order of said court, entered January 31, 2023 in Sullivan County, which, among other things, granted respondents' motion for partial summary judgment dismissing the petition/complaint, and (3) from a judgment of said court, entered June 26, 2023 in Sullivan County, which, among other things, dismissed petitioners' application, in a combined proceeding pursuant to CPLR article 78 and action for declaratory judgment, to review a determination of respondents charging petitioners for reimbursement of professional consulting expenses and counsel fees in relation to the review of petitioners' applications for building permits.

In September 2008, Double Diamond Inc., a national developer, applied to respondent Town Board of the Town of Forestburgh for approval to develop a resort and residential community in the Town. The proposed project, which was to be implemented in seven phases, called for the construction of over 2,500 residential lots and several recreational amenities. The project application was submitted under the Town's Planned Development Districts Law (hereinafter the PDD law), which, as relevant here, required applicants to deposit funds into an escrow account in an amount sufficient to reimburse the Town for certain consultant fees incurred during the PDD review and approval process (see Code of the Town of Forestburgh former § 85-19 [B] [1] [a] [xiii] [hereinafter Town Code]).[FN1] PDD zoning for the project was approved in 2011, with subdivision and site plan approval for phase 1 granted in 2013 in connection with a review under the State Environmental Quality Review Act (see ECL art 8 [hereinafter SEQRA]).[FN2]
Petitioners purchased the project from Double Diamond in July 2020, becoming the beneficiaries of the funds Double Diamond had deposited into the escrow account established under the PDD law (hereinafter the Lost Lake escrow). In November 2020, petitioners' general contractor applied for building permits to construct single-family homes on lots 301 and 302 in connection with phase 1 of the development. Building permits were issued shortly thereafter and a home was constructed on lot 301; however, the permit for lot 302 was subsequently revoked upon the discovery of title issues. Thereafter, the Town Board retained legal and engineering consultants to review any additional building permit applications submitted by petitioners, taking the position that their services were necessary to ensure that the dwellings sought to be constructed under phase 1 complied with the PDD zoning and site plan approvals granted in 2011 and 2013. In June 2021, petitioner's general contractor submitted another building permit application to construct a single[*2]-family home on lot 303, which was subjected to a review by the legal and engineering consultants hired by the Town.
The instant dispute concerns the Town's use of several thousand dollars from the Lost Lake escrow account to pay the consultant fees incurred during the building permit review process. After petitioners objected to the use of the escrow funds for that purpose, Town officials reviewed the Town Code and began the rulemaking process to amend certain provisions related to the use of escrow funds held in trust for development projects. In February 2022, the Town also passed a Local Law placing a three-month moratorium on all land use applications requiring reimbursement from escrow accounts.
Petitioners commenced this combined CPLR article 78 proceeding and declaratory judgment action asserting six causes of action seeking: (1) a writ of mandamus to compel replenishment of the Lost Lake escrow account and to prohibit further illegal disbursements; (2) a declaration that the disbursements were unlawful and respondents breached their fiduciary duties regarding same; (3) an injunction ordering an equitable accounting of the Lost Lake escrow account; (4) a judgment ordering respondent Daniel S. Hogue Jr., the Town Supervisor, and respondent Richard Robbins, the Planning Board Chair, to personally repay the Town for the replenishment of the Lost Lake escrow account under General Municipal Law § 51; (5) a judgment declaring Town Code § 68-16 (B) unlawful; and (6) a judgment declaring the moratorium on building permit applications unlawful. In a decision and order entered in August 2022, Supreme Court partially granted respondents' pre-answer motion to dismiss the petition/complaint to the extent of dismissing the second, third, fourth and sixth causes of action. Respondents thereafter answered and moved for summary judgment dismissing the remaining causes of action, and petitioners cross-moved for summary judgment on liability. By decision and order entered in January 2023, Supreme Court converted the first cause of action into a claim under CPLR article 78 in the nature of certiorari to review (see CPLR 7803 [3]), but did not make a final determination in that regard, finding the record insufficiently developed to do so. The court otherwise dismissed the fifth cause of action as moot. After the parties supplemented the record, Supreme Court, in a decision and order entered in June 2023, dismissed the first cause of action, finding that "respondents' actions [with respect to the disbursements from the Lost Lake escrow] were not arbitrary and capricious, an abuse of discretion, or affected by an error of law." Petitioners appeal from each of the three orders.
We turn first to petitioners' arguments relative to dismissal of the second through sixth causes of action. Contrary to petitioners' contention, Supreme Court properly dismissed the fifth cause of action challenging the facial validity of Town Code former § 68-16 (B) as moot. This Code [*3]provision was repealed in May 2022; therefore, petitioners' request for an order declaring this provision unlawful is no longer viable (see Cornell Univ. v Bagnardi, 68 NY2d 583, 592 [1986]; Matter of Truscott v City of Albany Bd. of Zoning Appeals, 152 AD3d 1038, 1039 [3d Dept 2017]). That this Code provision may have been unlawful before its repeal does not change the analysis, and the mootness exception does not apply in these circumstances (see Matter of Orsi v Board of Appeals of Town of Bethlehem, 3 AD3d 698, 701 [3d Dept 2004]; see generally Matter of Hearst Corp. v Clyne, 50 NY2d 707, 714-715 [1980]). Petitioners' sixth cause of action challenging the moratorium on building permit applications was also properly dismissed as moot, as the moratorium expired by its own terms in May 2022. The cases applying the mootness exception to moratoria challenges are factually distinguishable (compare Cellular Tel. Co. v Village of Tarrytown, 209 AD2d 57, 63-64 [2d Dept 1995], lv denied 86 NY2d 701 [1995]; Mitchell v Kemp, 176 AD2d 859, 859 [2d Dept 1991]) and petitioners have not shown "a significant combination of the required factors" necessary to warrant invocation of the exception in this case (Matter of Schulz v New York State Dept. of Envtl. Conservation, 180 AD2d 852, 854 [3d Dept 1992]; see Lenape Resources, Inc. v Town of Avon, 121 AD3d 1591, 1591 [4th Dept 2014]).
We are similarly unpersuaded by petitioners' contention that Supreme Court erred in dismissing the third cause of action seeking an equitable accounting of the Lost Lake escrow account. "An equitable accounting involves a remedy designed to require a person in possession of financial records to produce them, demonstrate how money was expended and return pilfered funds in his or her possession" (Metropolitan Bank & Trust Co. v Lopez, 189 AD3d 443, 446 [1st Dept 2020] [internal quotation marks and citation omitted]). "The elements include a fiduciary or confidential relationship, money entrusted to the defendant imposing the burden of an accounting, the absence of a legal remedy, and in some cases a demand and refusal" (id. [citation omitted]; see Matter of Mary XX., 33 AD3d 1066, 1068 [3d Dept 2006]; see also Bradkin v Leverton, 26 NY2d 192, 199 n 4 [1970]; LMEG Wireless, LLC v Farro, 190 AD3d 716, 720-721 [2d Dept 2021]; Gersten-Hillman Agency, Inc. v Heyman, 68 AD3d 1284, 1286 [3d Dept 2009]). Here, Supreme Court held that petitioners did not state a legally cognizable claim for an equitable accounting because they failed to allege the existence of a fiduciary relationship between themselves and the Town pertaining to the escrow funds. Although Supreme Court is correct that no fiduciary relationship was specifically alleged in the petition/complaint, the "criterion [on a motion to dismiss] is whether the proponent of the pleading has a cause of action, not whether he [or she] has stated one" (Leon v Martinez, 84 NY2d 83, 88 [1994] [internal quotation marks and citation omitted]). [*4]Nevertheless, the facts as pleaded do not give rise to a fiduciary or confidential relationship between the Town and petitioners sufficient to warrant an equitable accounting.
As noted above, under the PDD law, Double Diamond was required to deposit funds into an escrow account to pay certain costs and fees associated with the hiring of consultants to review the PDD proposal. Although the PDD law stated that the required deposit would be held in "escrow," and escrow agents owe "a fiduciary duty to a party with a beneficial interest in the escrow funds" (Lantz v Lantz, 217 AD3d 1228, 1230 [3d Dept 2023]), "[m]erely calling an act an escrow does not necessarily make it such" (Lennar Northeast Partners Ltd. Partnership v Gifaldi, 258 AD2d 240, 243 [4th Dept 1999] [internal quotation marks, brackets and citation omitted], lv denied 94 NY2d 754 [1999]; see Farago v Burke, 262 NY 229, 233 [1933]). The funds deposited into the Lost Lake escrow account existed for the benefit of the Town and the project applicants. The Town is not an independent third-party entity holding the money in trust for petitioners such that it assumed the role of an escrow agent with established fiduciary duties regarding the funds (see Rock Oak Estates v Katahdin Corp., 280 AD2d 960, 962 [4th Dept 2001]; see also Mortgage Elec. Registration Sys., Inc. v Maniscalco, 46 AD3d 1279, 1281 [3d Dept 2007]). Nor do the facts as pleaded give rise to a fiduciary or confidential relationship under the elements set forth in AG Capital Funding Partners, L.P. v State St. Bank & Trust Co. (11 NY3d 146, 158 [2008]), or amount to "special circumstances" warranting an equitable accounting in the interest of justice (Grossman v Laurence Handprints-N.J., 90 AD2d 95, 104-105 [2d Dept 1982]). In light of our determination that no fiduciary relationship existed between the parties, it follows that so much of petitioners' second cause of action as sought a declaration that respondents breached their fiduciary duties with respect to the escrow disbursements was also properly dismissed.[FN3] Nor do we perceive any error with respect to Supreme Court's dismissal of the claim under General Municipal Law § 51 (see Godfrey v Spano, 13 NY3d 358, 373 [2009]; Matter of Resnick v Town of Canaan, 38 AD3d 949, 951-952 [3d Dept 2007]).
For reasons that follow, we are also unpersuaded by petitioners' argument that Supreme Court erred in dismissing the first cause of action challenging respondents' use of funds from the Lost Lake escrow account to pay for consultant fees incurred in connection with a review of building permit applications submitted under phase 1 of the project.[FN4] As a threshold matter, Supreme Court did not err in declining to issue writs of mandamus compelling replenishment of the Lost Lake escrow account and prohibiting future illegal disbursements therefrom, as petitioners did not establish a clear legal right to these extraordinary writs (see Matter of Woodside Manor Nursing Home, Inc. v Zucker, ___ [*5]AD3d ___, ___, 2024 NY Slip Op 00211, *2 [3d Dept Jan. 18, 2024]; Matter of Clegg v Rounds, 222 AD3d 112, 117-118 [3d Dept 2023]). We discern no basis to disturb Supreme Court's conversion of this claim into one seeking certiorari to review under CPLR 7803 (3). Applying that standard, we agree with Supreme Court that the Town Board's use of the escrow funds to pay for consultant fees incurred during a review of the building permit applications was not "made in violation of lawful procedure, . . . affected by an error of law, . . . arbitrary and capricious or an abuse of discretion" (CPLR 7803 [3]).
The Lost Lake escrow account from which the challenged disbursements were made was established under the PDD law, which, as noted above, required applicants seeking to develop an area in a PDD zone to deposit funds into an escrow account "in an amount sufficient to reimburse the Town for reasonably estimated costs including fees of consultant(s) to be retained by the Town Board in order to assist the Town Board and Planning Board in reviewing the PDD application" (Town Code former § 85-19 [B] [1] [a] [xiii] [emphasis added]). The Town Board was required to "hold such deposit in escrow for the sole purpose of paying the costs and fees of the consultant(s) retained for review of the PDD proposal" (Town Code former § 85-19 [B] [1] [a] [xiii] [emphasis added]). These provisions plainly limited use of the Lost Lake escrow funds to pay for consultant fees incurred in connection with the PDD approval process. As petitioners acknowledged during oral argument, the Lost Lake escrow account could also be utilized to address applications to modify the approved project.
Here, the challenged escrow disbursements were made several years after PDD zoning and site plan approval for phase 1 of the project had already been granted. Given this context, petitioners argue that the use of the Lost Lake escrow to pay for consultant services attendant building permit applications was unauthorized as a matter of law. Respondents counter that PDD approval for the project was conditioned upon abiding by complex design and mitigation requirements set forth in the project's approval documents, thereby justifying the Town's use of the Lost Lake escrow account to pay for legal and engineering consultants to review the building permit applications to assure compliance with the underlying project approvals.
The authority to issue building permits within the Town is vested in the Code Enforcement Officer (see Town Code § 68-3 [A]), who "shall issue" a permit if the proposed work "is in compliance with the applicable requirements of the Uniform Code and Energy Code" (Town Code § 68-4 [F]). Thus, under the Town Code, the act of granting or denying a building permit is ministerial in nature (see Matter of Filmways Communications of Syracuse v Douglas, 106 AD2d 185, 187 [4th Dept 1985], affd 65 NY2d 878 [1985]) — with the primary focus being whether the proposed work complies with the Uniform [*6]Code and Energy Code. In fact, Glen A. Gabbard, the Town's Code Enforcement Officer, explained in an affidavit that building permit applications for single-family homes generally "need only a routine ministerial review." Nevertheless, after issuing building permits for lots 301 and 302, Gabbard reviewed the project approval documents in greater detail and discerned the need for further design review.
The PDD law provided that, as part of the PDD approval process, the Town Board could "set forth any conditions that [we]re reasonably related and incidental to the proposed project" (Town Code former § 85-19 [B] [2] [h]), which would "run with the land" and bind "future owners, operators, managers and occupiers" of the property for which PDD zoning was granted (Town Code former § 85-19 [B] [2] [j]). With respect to the project history, the Town Board approved a SEQRA Findings Statement on June 2, 2011, completing its environmental review for the proposed project. By resolution dated July 7, 2011, the Town Board granted PDD approval for the project, directing that the mitigation measures contained in the Findings Statement constituted conditions of the PDD approval and that the project must be "developed substantially consistent with the
. . . Site Master Plan, revised Open Space Plan, and revised Phasing Plan." Pertinent to the building permit applications at issue, the Findings Statement provided for permit applications to be addressed on a phase-by-phase basis, allowing the permitting agencies to address issues such as "[f]ire [p]revention and [b]uilding[ ] code compliance . . . and green building designs." In June 2013, the Town Board adopted a resolution granting Final Site Plan and Subdivision approvals for phase 1 of the project, finding that the plans submitted by Double Diamond were consistent with the PDD Site Master Plan and the mitigation measures set forth in the SEQRA Findings Statement.
The SEQRA Findings Statement imposed "covenants and restrictions on Home Site Development," subjecting all lot owners "to a declaration of exceptions, reservations, covenants, restrictions and conditions" for the project and requiring any lot owner seeking to build a home on the lot "to do so in full accordance with [the] Design Guidelines" to be set forth in the Offering Plan and Property Owners Association bylaws. The Findings Statement also called for the establishment of a "Lost Lake Architectural Control Committee [hereinafter ACC] for internal review for each proposed lot development" (emphasis added). Under this provision, such "Design Review Board [would] review and approve individual site plans in accordance with the Design Guidelines . . . in conjunction with review by the Town for building permits" (emphasis added). The meaning of the emphasized phrase, and the implementation thereof, is at the core of this dispute.
In September 2013, petitioners' predecessors in interest adopted "Declarations of Reservations, Covenants, Easements, Restrictions [*7]and Conditions for the Lost Lake Resort and Development" (hereinafter the Declarations), as called for in the Findings Statement. The Declarations specify that "[r]esidential dwellings within the [p]roperty will be of different styles, including detached residences, condominiums, homes with one or more common walls, patio homes or other types of homes; all of which shall be developed and maintained as part of a residential development of high quality, architectural design and condition." Pertinent here, the Declarations established the ACC to address compliance with design and construction standards for all construction on the property. The Declarations also imposed "restrictions" on the construction of all single-family dwellings, which include meeting "the first level of certification as set forth by [the Leadership in Energy and Environmental Design (hereinafter LEED)] Guidelines . . . or the [National Association of Home Builders] National Green Building Standard[s]." The Declarations further specify that each single-family home adjacent the golf course will "contain a minimum of [3,000] . . . square feet of heated/cooled floor space," with dwellings designated as patio homes to contain a minimum of 1,800 square feet and other lots to contain a minimum of 2,400 square feet.
With this background, we turn to the denial of petitioners' permit application for lot 303, which called for the construction of a single-family home with 2,030 square feet of floor space. By letter dated October 7, 2021, Gabbard wrote to petitioners' counsel requesting additional information regarding the home sought to be constructed on lot 303, including "information necessary to show conformity with the 2013 Lost Lake Resort Design Guidelines for Single-Family Homes" (internal quotation marks omitted). Gabbard further inquired as to the authority underlying the ACC's approval of the design plan based on 2021 revisions to the 2013 project Declarations and Design Guidelines.[FN5] In response, petitioners' attorney took the position that neither Gabbard nor the Town Board had authority to assess whether the proposed residence was in compliance with project design guidelines, but submitted additional information requested by Gabbard, including "documentation from a qualified professional confirming that the home [on lot 303] has been designed to meet the criteria for LEED certification." By letter dated November 23, 2021, Gabbard denied the application, finding that it was "inconsistent with the 2013 project approval documents." Gabbard elaborated that the project "was proposed to be a planned resort community and upscale recreational destination consisting of a gated community of single[-]family residence lots built to certain design standards." Gabbard continued that petitioners' attorney represented their intent to build " 'reasonably priced and affordable [housing] units' with no indication regarding whether other project components will remain the same or whether anticipated [*8]impacts of an affordable housing community were contemplated or reviewed prior to the 2013 approval." Additional building permit applications were also denied on this basis.
From our perspective, a genuine factual dispute has been raised as to whether the lot 303 application, which proposes to construct a residence based on revisions to the Declarations and Design Guidelines made in 2021, constitutes a modification of the underlying project approvals. Petitioners do not dispute that the Declarations and Design Guidelines were modified in 2021, but failed to answer Gabbard's inquiry as to whether the 2021 revisions comported with the 2013 approved design. We are mindful that the original Design Guidelines submitted with the September 2008 PDD application provided that only a Design Review Board established by the developer could review and amend design guidelines. Even so, it bears emphasis that the Findings Statement expressly obligated lot owners to comply with Declarations to be recorded, along with "a Builder's Packet outlining information required to be submitted to the" ACC. These directives were made conditions of the project approval. Given the uncertainty presented by the 2021 revisions to the Design Guidelines, the Town Board, as well as Gabbard, reasonably determined that an assessment as to whether the 2021 design revisions constituted a project modification was required. To resolve that question, respondents were entitled to utilize the Lost Lake escrow account to pay the consultants retained to assist in that review.
Finally, notwithstanding respondents' failure to comply with the PDD requirement to provide consultant invoices to petitioners in advance of payment, we conclude that the record supports Supreme Court's determination that the consultant expenses were not unreasonable.
Egan Jr., J.P., Clark, McShan and Mackey, JJ., concur.
ORDERED that the orders and the judgment are affirmed, without costs.

Footnotes

Footnote 1: The PDD law was repealed in January 2020, but the parties' rights and responsibilities under the project approvals remain intact.

Footnote 2: Phase 1 consisted of constructing approximately 400 single-family homes and the first nine holes of the project's golf course.

Footnote 3: We note that petitioners were entitled to an accounting under the PDD law itself, which required the Town Board to provide the project applicants with "detailed invoices showing the services rendered for the time-period billed" by consultants retained to review the PDD proposal prior to payment of the invoices (Town Code former § 85-19 [B] [1] [a] [xiii]). Although respondents have provided petitioners with a copy of all documents and receipts pertaining to the challenged escrow disbursements, they did so belatedly. Respondents' failure to provide these invoices earlier was thus "in violation of lawful procedure" (CPLR 7803 [3]). However, because the invoices and receipts have been provided to petitioners and were reviewed by Supreme Court in determining the propriety of the payments made from the Lost Lake escrow account, no further remedy is necessary.

Footnote 4: Petitioners do not challenge the denial of the building permit applications in this proceeding.

Footnote 5: The 2021 revisions are not included in the record.